IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

## IN RE ANARI E., ET AL.

**Appeal from the Juvenile Court for Hickman County**
**No. 20-JV-12     Amy Cook Puckett, Judge**

_____

### No. M2020-01051-COA-R3-PT

_____

This appeal concerns the termination of a father's parental rights to his two minor children. Thomas Miller ("Petitioner"), guardian ad litem, filed a petition in the Juvenile Court for Hickman County ("the Juvenile Court") seeking to terminate the parental rights of Desia E. ("Father") to Anari E. and Chrifayni O. ("the Children," collectively). After a trial, the Juvenile Court entered an order terminating Father's parental rights on six grounds and finding that termination of Father's parental rights is in the Children's best interest, all by clear and convincing evidence. Father appeals, arguing Petitioner failed to meet his burden as to any of the grounds and as to best interest. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Kelli Barr Summers, Brentwood, Tennessee, for the appellant, Desia E.

Thomas H. Miller, Franklin, Tennessee, appellee-guardian ad litem.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

In May 2012, Anari was born out of wedlock to Christian O. ("Mother") and Father. In January 2018, Chrifayni was born to Mother. No father was listed on Chrifayni's birth certificate, but Father held himself out as Chrifayni's father. On April 30, 2019, Mother died of a drug overdose. Father was incarcerated at the time of Mother's death. Before Father's incarceration, he lived with Mother and the Children. The Children thereafter entered the custody of the Tennessee Department of Children's Services ("DCS"). The Children were placed in the care of Cathy O. ("Great Aunt"), their maternal great aunt.

In May 2019, Petitioner, the Children's guardian ad litem, filed a petition in the Juvenile Court seeking to adjudicate the Children dependent and neglected. In July 2019, Petitioner filed an amended petition. Petitioner alleged, among other things, that "Anari will point out 'bad people' who used to 'do ice' or other drugs at her home." Petitioner alleged also that Anari said that "Daddy would hit 'Fayni' in the face when she wouldn't stop crying and that once he 'busted her lip.'" A permanency plan was crafted for Father, with his participation, to include goals of return to parent and exit custody with relative. In July 2019, the permanency plan was ratified. The Juvenile Court found the plan's requirements reasonable and related to remedying the conditions necessitating foster care and in the best interest of the Children.

In August 2019, the Juvenile Court heard, and granted, an emergency motion to suspend Father's visitation with the Children. The Juvenile Court found that on an attempted visit in July, Anari was "inconsolable" at the sight of Father. The Juvenile Court stated: "It is not necessary for the Court to decide today the reason for Anari's conduct. It is enough to find that this grieving child is clearly not ready to have visitation with her father." In November 2019, the Juvenile Court heard Petitioner's amended dependency and neglect petition. Father did not appear for the hearing. Afterward, the Juvenile Court entered an order finding the Children dependent and neglected. The Juvenile Court found, in part:

> 6. Today [Great Aunt] testified that Anari has told her that she saw her father drag her mother down the hall by her hair, witnessed physical altercations between her parents, and saw him push her mother out of the car and shove her head into the side of a car window.
> 7. Anari told [DCS worker] Ms. Thomas that her father had raped her mother and other women. Anari correctly told her that rape was sex without consent.
> 8. Anari and Chrifayni have been exposed to drug use by both parents.

9. Anari's vocabulary is consistent with a child who has been exposed to drug use and sales; e.g., she can identify what different kinds of drugs are. She knows what drugs and drug paraphernalia are.

10. [Father] abused Chrifayni when he struck her in the face because she would not stop crying.

11. Ms. Thomas testified that Anari's statements regarding domestic violence and witnessing drug use and sales were consistent.

\*\*\*

13. [Great Aunt] testified that Anari knows too much and has experienced too much for her age. The Cour[t] agrees. Some of her innocence has been lost due to her exposure to the drug culture, domestic violence and her knowledge of rape.

14. The fact that Anari's cumulative life experience has resulted in a diagnosis of PTSD is relevant to both adjudication and disposition.

In a separate dispositional order, the Juvenile Court found that Great Aunt was providing proper care for the Children and that the Children's needs were being met by her. The Children were to remain in DCS custody, and Father was barred from contacting them. Before he could petition to change the order, Father was to provide proof of completion of domestic violence courses, proof of completion of alcohol and drug rehabilitation, and submit to drug screens. A revised permanency plan was ratified in January 2020. This time, Father did not participate in the plan's development. This revised plan added two additional requirements: (1) complete a full psychological assessment and follow recommendations and (2) submit to a parenting assessment and follow recommendations.

On January 21, 2020, Petitioner filed his petition seeking to terminate Father's parental rights to the Children. After the petition was filed, Father went to jail again. On February 28, 2020, Petitioner filed an amended petition to terminate parental rights, this time to include abandonment grounds concerning an incarcerated parent such as wanton disregard. In June 2020, Petitioner filed a second amended petition, this time to correct an error concerning his consultation of the putative father registry, for which the Juvenile Court granted leave. In addition, Father filed an answer to Petitioner's February amended petition.

In June 2020, this matter was tried. Father did not appear. Alexus Thomas ("Thomas"), DCS family services worker on the Children's case since May 1, 2019, testified first. When the Children first entered state custody, they were placed with a cousin through an expedited placement. This placement did not last long as the cousin and her

mother were unwilling to comply with all of the necessary requirements. On May 15, 2019, DCS placed the Children with Great Aunt, who previously sought custody of them. Father was incarcerated at this time. Thomas was able to reach Father in June 2019 to inform him that she was assigned the Children's case and invite him to a permanency plan meeting. Father inquired as to how the Children were doing at that time. Father, by now out of jail, participated in the development of the permanency plan. Father expressed a desire to have the Children placed with him. Under the permanency plan, Father was to submit to an alcohol and drug assessment and follow the recommendations; complete a mental health assessment and follow recommendations; obtain a legal source of income and provide proof of it; have a safe and stable home and provide proof of it; and establish paternity of Chrifayni and participate in therapeutic supervised visitation. As it happened, Father never completed an alcohol and drug assessment. DCS scheduled an assessment for June, but Father was incarcerated for a three-week span and could not participate. DCS then set up another drug and alcohol assessment that could be completed in August or September. Father, however, did not complete an assessment in those months.

On January 29, 2020, Father went to jail and remained there through April 2020. Upon Father's release, Thomas contacted him about finally completing an alcohol and drug assessment. Thomas testified that Father told her he used marijuana daily and was never going to stop. Thomas stated that Father later said he would "handle it through his own provider." Asked if Father knew about the trial date, Thomas stated that Father had confirmed the trial date with her and he knew when the trial was taking place. Thomas testified that, two days before trial, Father reiterated to her that "he uses marijuana daily and would use it until he died and he was not going to take the -- or complete the alcohol and drug assessment." In July 2019, Father refused to undergo an oral swab drug screen and insisted on a urine screen instead. Father never acknowledged to Thomas that he used any other drugs besides marijuana.

In October 2019, Father completed a mental health assessment. It was recommended that Father complete therapy two to four times a month. Father had a follow-up appointment but, as of April, he had no additional follow-up appointments. Asked why, Thomas stated: "I asked him to follow up with Centerstone to see if he could schedule through telehealth and to let me know if they were able to get appointments for him, and he said he would." Father never let Thomas know whether he followed up. Upon Father's first release from custody during this case, he was living with his mother. Father told Thomas he wanted the Children to live at his mother's residence. Father had inquired about setting up a home walk-through in August 2019. However, Thomas could not reach Father after August 14th as his phone was disconnected. When Father was released from jail in April 2020, Thomas asked him if he would like to schedule a walk-through at his mother's home. At this point, Father stated his mother's home was not appropriate. Thomas testified that, as best she knew, Father lived on and off with his mother. The week before trial,

-4-

Father told Thomas he had gotten approval for housing with Buffalo Valley. In the past year, Thomas had offered to assist Father with housing. Father asked Thomas for housing guides for Hickman County. In June or July last, Thomas offered Father options for housing in surrounding counties because there were better options there for low income people. Father replied that those options were unacceptable, and he was adamant about living in Hickman County. Father had not shown Thomas a lease for his new housing, and she had been unable to verify he had been accepted by Buffalo Valley.

Regarding what Father does for a living, Thomas testified that on two occasions Father reported working for a painting company. In April 2020, Father provided Thomas with a written note stating: "[Father] works here. He works 40 hours a week." The note said nothing about an hourly rate or how much Father makes. Father never told Thomas he had another source of income, or that he had any disability that prevented him from working a job. Thomas stated that Father never raised a work schedule as a reason why he could not make a particular appointment or see the Children. Father also never mentioned any expenses he had.

Continuing her testimony, Thomas stated that Father never paid any child support. Father had offered to buy the Children clothes and asked for their sizes. However, Father never followed up. In April, Father gave Anari a cake and a doll for her birthday; that was the extent of the support. Thomas and Father had a difficult state of relations over the case. Father would tell Thomas she needed to do her job and get his kids back. At one point, Father even sued Thomas. However, Thomas stated their relations later improved. Thomas testified further that Father never established paternity of Chrifayni. In November 2019, a new permanency plan was developed. Father did not participate in the plan's development even though he was informed about it. New goals under this plan were "return to parent" and "adoption," with "exit to relative" replaced. Thomas explained: "Due to the little to no progress towards the goal of return to parent and the girls doing so well in that home, we then decided that adoption would be better to provide them a more stable form of permanency."

Thomas was asked if there were any areas in which Father completed any action steps on the permanency plan. Thomas stated that Father signed a release reflecting he had a mental health assessment. Father also purportedly found housing as of the week before, although he had not shown Thomas a lease agreement or arranged for a walk-through. Father did not describe the residence to Thomas in any detail. Thomas testified that, to her knowledge, there was no four-month stretch during the custodial period in which Father showed residential stability. Thomas testified that, despite her efforts, Father never met her halfway in the case. Criminal records entered as an exhibit reflected that in October 2019, Father tested positive for amphetamines, methamphetamines, and THC. Thomas

stated that in her view, terminating Father's parental rights would be in the Children's best interest.

On cross-examination, Thomas acknowledged that records from 2015 of earlier DCS involvement with the family showed that Anari seemed to have a good bond with Father. Thomas testified also that Great Aunt had to get a waiver for placement because she had a criminal history, although Thomas did not know what the charges were or how old they were. With respect to visitation, Thomas was asked why Anari could determine whether Father could visit her. Thomas stated this was because "[Anari] was uncomfortable with visiting and said that she did not want to." Regarding the incident wherein Father refused an oral swab drug screen in favor of a urine screen, Thomas stated that the results of that screen were negative. On the subject of Anari's health, Thomas stated that Anari saw a therapist twice a month. Asked whether Father's bid for housing was a legitimate effort to meet the goal of suitable housing under the permanency plan whether he had obtained it yet or not, Thomas agreed that Father was seeking housing.

As cross-examination carried forward, Thomas testified that Anari told her in March 2020 that she wanted to go to a father/daughter dance but Great Aunt said no. Anari said that Great Aunt "doesn't let her do anything." Thomas stated that, from August 2019, Father could only visit Anari if the therapist recommended it was appropriate. With regard to Chrifayni, Thomas stated that Father's visitation with her was halted after an incident in which Anari slapped his hand as he reached in to get Chrifayni out of her car seat. Thomas acknowledged that she never affirmatively followed up on Father's initial suggestion that the Children live with his mother. Thomas never personally called Father's mother and asked her about a walk-through. Thomas then was asked about some phone calls between Father and Anari from earlier in the custodial period. Thomas testified: "[Father] reported to me that when he tried to speak to Anari, that she said she didn't want to talk to him because he was the reason that her mother was dead and he got her hooked on drugs." Thomas stated that Anari has PTSD. Thomas testified further that Anari was sitting in her Mother's lap at the time Mother died of a drug overdose. On the issue of responsibility for poor communications, Thomas acknowledged that Father was not supposed to call her from August 13th through November 7th of the past year. Thomas stated that she had verified that Father was on a waiting list for Buffalo Valley and had enrolled with Centerstone.

On redirect, Thomas was asked about the incident the previous year that led to the suspension of Father's visitation. Thomas stated that when Anari saw Father: "She became upset. She started to cry and scream. As he came closer to the car, she would scream, 'Get away.'"

Next to testify was Dana Nicholson ("Nicholson"), Hickman County Court Clerk. Nicholson stated that a capias was issued for Father on December 3, 2019 because Father

failed to appear in the General Sessions Court for Hickman County on December 2, 2019 to answer to a number of charges including habitual motor vehicle offender and domestic violence. The charges, which stemmed from 2017 to 2019, were still pending. According to Nicholson, when the capias is executed, Father will be incarcerated until he appears in court, with bond set at $12,000.

The final witness to testify was Great Aunt. Great Aunt testified that Mother was her brother's daughter, thus the Children were her great nieces. Great Aunt testified that Anari was, and remains, "an emotional wreck." Regarding Anari's emotional state, Great Aunt stated: "She has good days, she has bad days." Great Aunt testified that Anari nevertheless had shown improvement overall. Great Aunt stated that Anari has a constant fear of being made to go back with Father. When asked if she had ever said or done anything to turn Anari against Father, Great Aunt testified: "Never." Great Aunt testified that Anari does not sleep well, and sees a counselor. Anari takes medication to help her sleep. Great Aunt testified that she had a child by a cousin of Father's. Regarding her relations with Father generally, Great Aunt testified: "[F]rom my … experiences knowing his relationship with my niece, it's not been good. I don't approve of things he's done. Her, either. But the domestic violence was the worst." Great Aunt testified that Father never inquired as to how the Children were doing. As for child support, Great Aunt testified that the only things Father ever provided were a birthday cake and gift for Anari on her most recent birthday. Great Aunt testified that Anari was smart but began having behavioral problems towards the end of the year. Great Aunt stated that Anari wanted to be near her, especially at night. Asked what the likely effect would be were Anari required to live somewhere else, Great Aunt stated: "Devastating, traumatic." Great Aunt testified that she was willing to adopt the Children. Great Aunt stated: "I have had five of Chrissy's six children at some point in their lives. This isn't the first time." Asked on cross-examination if it were fair to say she was not a "fan" of Father, Great Aunt testified: "I wouldn't hang out with him."

In July 2020, the Juvenile Court entered its final judgment. The Juvenile Court found that Petitioner had proven against Father by clear and convincing evidence the following grounds: (1) abandonment by failure to support; (2) abandonment by wanton disregard; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plans; (5) persistent conditions; and, (6) failure to manifest an ability and willingness to assume custody. The Juvenile Court found further by clear and convincing evidence that termination of Father's parental rights is in the Children's best interest. In its detailed final judgment, the Juvenile Court found, in part:

[Failure to support]

-7-

[Father] has been incarcerated during all or part of the four (4) months immediately preceding the filing of the guardian ad litem's amended termination of parental rights petition on February 28, 2020. Certified copies of convictions from Davidson County reflect that on July 12, 2019, [Father] was convicted of driving on revoked license second offense and was sentenced to serve eleven months and 29 days in Davidson County. That sentence was suspended to supervised probation. On February 5, 2020, his Davidson County probation was revoked and that sentence was placed into effect. On April 1, 2020, [Father's] motion to suspend sentence was granted, and he was released to probation through Davidson County.

Upon finding that [Father] was incarcerated during all or part of the four months immediately preceding the guardian ad litem's amended petition, the statute also requires the court to consider whether Father has failed to visit *or* has failed to make reasonable payments toward the support of the children. Father has not visited with the children since July of 2019.

Until recommended by Anari's therapist, visitation between the children and [Father] was suspended by the Court. [Father], who has been afforded four court-appointed attorneys since June of 2019, has not filed a motion with the Court to resume visitation. In fact, [Father] did not appear at the dependency and neglect adjudication and dispositional hearing on November 7, 2019, and he did not appear at the termination of parental rights trial on June 4, 2020. Still, the Court does not find willfulness on the part of [Father] for not visiting with the children given that a court order requires the recommendation of Anari's therapist to resume visitation.

The statute further requires the Court to consider whether Father has failed to make reasonable payments toward the support of the children. [Father] clearly and convincingly has not supported his children. Other than a birthday cake and gift sent to Anari for her birthday in May of 2020, [Father] has provided no financial support to the children while they have been in foster care. He has not provided in-kind support either such as clothes, school supplies, diapers, food, etc. He did not appear at trial to offer an affirmative defense.

Additionally, during the respective time frames that [Father] has not been incarcerated while the children have been in foster care, he has been buying drugs. Ms. Thomas testified that [Father] told her that he will use marijuana until he dies. The Court finds by clear and convincing evidence that [Father's] incarceration during the relevant statutory period and his

failure to make reasonable payments toward the support of his children constitute abandonment by clear and convincing evidence.

[Wanton disregard]

Another statutory ground for termination of parental rights is abandonment by the parent pursuant to Tenn. Code. Ann. § 36-1-102(g)(1), Tenn. Code Ann. § 36-1-102(1)(A)(iv). The Court finds by clear and convincing evidence that Respondent [Father] has engaged in conduct that exhibits a wanton disregard for the children's welfare. While the children have been in foster care, [Father] has been incarcerated multiple times and has pending charges. Mr. Miller filed his petition on February 28, 2020, at that time [Father] had been incarcerated in Davidson County. He was released from there in April of 2020. He has an outstanding arrest warrant in Hickman County.

When the guardian ad litem filed his dependency and neglect petition on May 7, 2019, [Father] was incarcerated in Davidson County for contempt for failure to pay child support. Ms. Dana Nicholson, Hickman County Circuit Clerk, testified that a capias was issued for [Father's] arrest on December 3, 2019, in Hickman County. She stated that the outstanding capias resulted from [Father's] failure to appear in Court on December 2, 2019, for the following charges: driving on revoked driver's license, driving after declared Habitual Motor Vehicle Offender, violation of bond conditions, traffic citations, domestic violence, and violation of order of protection. Ms. Nicholson explained that all charges are pending in Hickman County.

Respondent [Father] has engaged in conduct that exhibits a wanton disregard for the children's welfare by engaging in ongoing criminal acts. While incarceration alone is insufficient for the Court to find this ground, incarceration is a triggering mechanism that allows the Court to look into Father's past conduct. *In re Audrey S.* 182 S.W.3d 838 (Tenn. Ct. App. 2005). *In re Audrey S.* provides examples of conduct that demonstrate wanton disregard: probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child (182 S.W.3d 838 Tenn. Ct. App. 2005).

Certified copies reflect criminal convictions of Respondent [Father] in Rutherford County, Tennessee. On January 9, 2012, [Father] pled guilty to DUI and Contraband in a Penal Facility. For the DUI, he received a

sentence of eleven months and 29 days to be served on probation; for Contraband in a Penal Facility, he received a sentence of three years concurrent with the DUI. He was also sentenced to 118 days, time served. For Schedule II Drugs: Cocaine/Meth, [Father] received three years consecutive to Contraband in a Penal Facility, for a total of six years probation. Certified copies of a June 23, 2017, Rutherford County Violation of Probation/Supervision Order reflect that [Father] served thirty-eight days for a probation violation.

Ms. Alexus Thomas testified that when she offered [Father] help with completing an alcohol and drug assessment, he declined help from DCS and informed her that he would use marijuana until he dies. Ms. Thomas also testified that [Father] has not financially supported the children while they have been in foster care.

The examples of wanton disregard described in *In re Audrey* are comparable to [Father's] behavior, and this Court findings by clear and convincing evidence abandonment by wanton disregard for the welfare of the children. [Father's] poor judgment and bad acts demonstrate willful abandonment pursuant to Tennessee Code Annotated by clear and convincing evidence.

[Failure to provide a suitable home]

Pursuant to *Tenn. Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii)*, the children were removed from [Father's] home or his physical or legal custody by a Court order after a petition was filed alleging that the children were dependent or neglected children, and the children were placed in DCS custody; the Court found that the Department of Children's Services made reasonable efforts to prevent removal of the children or that the circumstances of the children's situation prevented reasonable efforts from being made prior to the children's removal; and for a period of four (4) months following the physical removal, the Department made reasonable efforts to assist [Father] to establish a suitable home for the children, but [Father] has not made reciprocal reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that he will be able to provide a suitable home for the children at an early date. [Father] was aware that the children were in the custody of the DCS, and the Department's efforts to assist [Father] in establishing a suitable home for the children equaled or exceeded [Father's] efforts toward that same goal.

-10-

On July 16, 2019; November 7, 2019; January 21, 2020; and on April 14, 2020, the Juvenile Court found that DCS has been making reasonable efforts towards remedying the conditions that necessitate foster care. Ms. Alexus Thomas, DCS, has served as the Department's Family Service's Worker (FSW) throughout the entire period that the children have been in foster care. Ms. Thomas testified that she offered appropriate services to help him get his children back but that [Father] did not meet her half way.

***

Ms. Thomas testified that she verified that Father is on a waiting list for housing through Buffalo Valley. She explained this housing program is not part of the Buffalo Valley drug and alcohol rehabilitation program. Ms. Thomas testified that she does not know when [Father] will obtain housing but that [Father] told her he would have a home within a week. Ms. Thomas testified that she has not seen a lease agreement or a residence of [Father]. Despite having notice of the trial, [Father] did not appear in Court to offer proof of suitable housing.

In considering whether Father demonstrated a lack of concern for the children such that it was unlikely he would be able to provide a suitable home at an early date, the Court "may consider the parents' more recent behavior." *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at [*]9 (Tenn. Ct. App. Sept. 26, 2017). [Father] admitted to using marijuana daily to Ms. Thomas as recently as June 2, 2020. She testified that he stated to her that he would never stop using marijuana. She stated that she set up authorization for an assessment beginning in June of 2019. She stated that she set up the assessment again in August 2019, but that [Father] never completed it. She stated that he agreed to call back to schedule but that he did not follow through.

Ms. Thomas testified that [Father] has not provided proof of completion of an alcohol and drug assessment. Ms. Thomas testified that [Father] has not provided proof of completion. In the context of this statute, a "suitable home" means "'more than a proper physical living location'" it must also "be free of drugs and domestic violence." *In re Billy T.W.* at *8 (quoting *In re Hannah H.*, No. E2013-0123-01211-COA-R3-PT, 2014 WL 2587497, [at] *9 (Tenn. Ct. App. June 10, 2014)). Father has not made reciprocal reasonable efforts to provide a suitable home, and the Court finds by clear and convincing evidence that [Father] has abandoned the children pursuant to this ground.

-11-

***

[Substantial noncompliance with the permanency plans]

The Respondent has not substantially complied with the responsibilities of the permanency plans. Father did not appear to testify or offer proof of compliance with the permanency plan. Even if father acquires housing soon, he would need additional time to comply with the permanency plans that have been developed since June 2019. Father needs to demonstrate stable housing, employment and sobriety. He needs to provide proof of completing a parenting assessment and compliance with mental health recommendations. Furthermore, he would need to restart visitation with the children. The Court did not hear proof or testimony from anyone to verify Father's housing plans. Additionally, [Father] needs to resolve pending criminal charges in Hickman County.

***

[Persistent conditions]

[Father] has missed multiple opportunities to be heard in court proceedings and to engage in social services offered by DCS. The entire time that the children have been in DCS custody, Father has not had any periods of residential stability that Ms. Thomas could verify. Ms. Thomas testified that [Father] lived with his mother; however, [Father] did not provide consent from his mother for Ms. Thomas to do a homestudy report. Ms. Thomas testified that [Father] later told her that his mother's home was not appropriate. Ms. Thomas testified of periods of weeks and months when she did not know where he was living. She stated that she assumed where he lived but did not know with certainty. Ms. Thomas testified that during the periods when [Father] was not incarcerated, he did not work services with DCS to become available to parent the children or provide financial support to the children.

The persistence of conditions ground for termination of parental rights applies to conditions at the time of the children's removal from their parent's custody and to conditions that have developed since their removal. [Father] has been incarcerated for a probation violation since the children came into foster care. He has not used the opportunity between incarcerations to get treatment, despite having the resources of DCS at his disposal.

-12-

The conditions persist that prevent the children's safe return to the care of the father because he does [not] have a stable residence. Ms. Thomas stated that Father told her that he anticipates having housing within a week, though she has not seen a lease agreement. Upon [Father's] acquiring housing, he will need several months to demonstrate sobriety and stability.

Father has not appeared to testify as to having a job. Ms. Thomas stated that he had provided her with a note from an employer stating that [Father] works forty hours. She stated that she does not know how much he earns. This Court did not hear any testimony from [Father's] support network or potential employer.

Continuing the parent/child relationship diminishes the children's opportunities of early integration into a stable and permanent home. The existence of the legal bond between the children and their father prevents them from adoption. Focusing on the results of [Father's] efforts, he has not demonstrated his ability to provide a safe environment for his children.

\*\*\*

While the father's incarcerations in 2019 led to the children's removal, the children's prolonged stay in foster care is the result of decisions made by father after his release from jail to resume criminal activity. There is little likelihood that these conditions will be remedied at an early date so that these children can be returned to their father's care soon. When Father acquires housing, he would need considerable time to demonstrate sobriety and stability.

\*\*\*

[Failure to manifest an ability and willingness to assume custody]

As of the date of the filing of the TPR petition or the hearing, [Father] had not manifested an ability and willingness to assume legal and physical custody of his children. Father did not appear in court to express his desire to personally assume responsibility of the children. Father continues to put off addressing substance abuse issues. He has been re-arrested and incarcerated during the time the children have been in foster care. At the time he began serving a probation violation in Davidson County in February of 2020, the children had been in foster care for approximately nine months.

-13-

It is unsafe to return the children to [Father's] care until he has demonstrated stability and sobriety. Father's refusal to address substance abuse issues and to support his children reveals neither a willingness nor ability to assume legal and physical custody of or financial responsibility of them. DCS FSW Alexus Thomas testified of concerns with Father's anticipated plans for housing: she had not seen a lease or home yet. Even if father's anticipated home were to be approved, [Father] would need to establish sober and stable living for a meaningful period. He would need to agree to take drug screens and pass drug screens upon request by DCS. [Father] would also need to provide support to and bond with his children.

\*\*\*

[Best interest]

Since May of 2019, father's residential instability, drug abuse, criminal activity, and repeated incarceration have led to a prolonged absence from the children. Father did not appear at the termination proceeding to acknowledge a desire to regain custody. Even if he does desire to regain custody, he would require time to demonstrate that he has made adjustments for sober and stable living. Father's unstable living situation is not in the children's best interests. These children deserve permanency….

\*\*\*

Father was unavailable to parent the children when they came into custody due to incarceration. During the time the children have been living in foster care, he has been incarcerated again and has pending charges. The children need a safe, stable home. Thirteen months is more than enough time for Father to have demonstrated a meaningful period of stability….

\*\*\*

Though Father has expressed an interest in the children's well being to Ms. Thomas, visitation with the children has been delayed since July of 2019. This delay is partly due to a recommendation from Anari's therapist and partly due to father's actions. The Final Order of Adjudication and Disposition entered on November 12, 2019 requires that [Father] provide proof of completion of domestic violence courses and alcohol and drug rehabilitation and submit to drug screens. Father has not provided proof of completion of domestic violence classes and alcohol and drug treatment. Father did not appear at that hearing, and Father has not testified at the

termination trial of a desire to visit with the children and to re-establish a bond with the children….

\*\*\*

The Court has not heard proof that a meaningful relationship exists between Father and the children. Father has not made it possible for the children to go home with him. Father did not appear at trial to testify about his relationship with his children…

\*\*\*

The children have been placed with a relative caregiver for over a year. Ms. Thomas testified that the children have lived with [Great Aunt] since May of 2019. Ms. Thomas testified that her home is suitable for the children and that termination of [Father's] parental rights is in the children's best interests…

It is not in the children's best interests to delay permanency for another six months to see if things are going to [be] different with Father. They are living the life that the legislature opposes: foster care beyond that which is reasonably necessary….

\*\*\*

This Court has previously found that the children were dependent and neglected due to Father's incarceration and their exposure to domestic violence by their caregivers and their exposure to drug use in their home by the parents and other persons. The Court found that Chrifayni is an abused child due to injuries sustained and risk of injuries sustained when [Father] struck her on the face causing her lip to bleed….

\*\*\*

Father has not presented a suitable home for the children. Ms. Thomas has offered help with drug and alcohol assessments. Father has declined, and he told DCS FSW, Alexus Thomas, that he will never stop using marijuana. Father has refused drug screens from DCS. Prior to the children's entering foster care, the parents had [been] using drugs in their home. [Father] has had repeated incarcerations while the children have been in foster care, and he has pending criminal charges for which he has failed to appear in court….

-15-

\*\*\*

The Court did not hear sufficient proof concerning Father's mental and/or emotional status…

\*\*\*

Father has not financially supported the children….

\*\*\*

All factors except number eight support termination of parental rights. The proof clearly and convincingly supports a finding that termination of Father's parental rights is in the best interest of [the Children].

Father timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of failure to support; 2) whether the Juvenile Court erred in finding the ground of wanton disregard; 3) whether the Juvenile Court erred in finding the ground of failure to provide a suitable home; 4) whether the Juvenile Court erred in finding the ground of persistent conditions; 5) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; 6) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; and, 7) whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley*

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.

-17-

*In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id.* This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id.* If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id.* Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id.* (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We begin with the three abandonment grounds at issue. The ground of abandonment is set forth in statute as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2020).

As to the specific types of abandonment found by the Juvenile Court in this case, the Tennessee code defines them as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> ***
>
> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have

demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

*** 

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment;

*** 

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

*** 

-21-

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children; and
(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102 (West July 1, 2019 to March 5, 2020).

We first address whether the Juvenile Court erred in finding the ground of failure to support. In his brief, Father asserts: "The [Juvenile] Court … uses the wrong four-month period. It should not be calculated from the time of the filing of the first amended petition but from the date of the filing of the original petition." According to Father, the abandonment grounds for an incarcerated parent do not apply here. Father cites to no authority on this point. Petitioner argues, in response, that a 2018 amendment to Tenn. Code Ann. § 36-1-102 expressly provides for the four-month window to be triggered by the date of the filing of an amended petition. However, that 2018 amendment was to Tenn. Code Ann. § 36-1-102(1)(A)(i), failure to support by non-incarcerated parents. Tenn. Code Ann. § 36-1-102(1)(A)(iv), failure to support by incarcerated parents, was only amended to expressly account for amended petitions by 2020 Pub.Acts, c. 525, § 1, eff. March 6, 2020, which was after both the original petition and amended petition were filed.

In *In re Chase L.*, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at \*9 (Tenn. Ct. App. June 29, 2018), *no appl. perm. appeal filed*, a parent was incarcerated after the filing of the first petition and DCS filed an amended petition to include the ground of wanton disregard. On appeal, this Court held that where an amendment raises an entirely new ground or grounds based upon events that occur after the filing of the original petition,

-22-

it is in fact a supplemental pleading governed by Tenn. R. Civ. P. 15.04, thus requiring leave of court. *Id.* at *11.[4] No such leave was obtained. *Id.* However, this Court found nevertheless that the ground was tried by implied consent as the parent had the benefit of DCS's supplemental pleading and DCS's announcement in opening statements at the hearing that it intended to rely upon the ground of wanton disregard and still did not object. *Id.* at *12. The facts of the instant case are quite similar. The original petition was filed on January 21, 2020. Father went to jail on January 29, 2020. Petitioner filed his amended petition based upon new factual allegations on February 28, 2020. DCS concedes, and the record reflects, that Petitioner never obtained leave of court under Rule 15.04 for a supplemental pleading. Father filed an answer to the amended petition. At the beginning of trial in this matter, Petitioner stated that he intended to rely upon the incarcerated parent ground, including wanton disregard, and Father did not object. Under these circumstances, we find the additional grounds were tried by implied consent.

On failure to support, Father states that "[i]t is uncontroverted that the father was indigent." However, Father did not raise lack of willfulness as a defense to his failure to support, either in his answer or at trial. In addition, Thomas testified that Father showed her a note reflecting he worked 40 hours per week. Thomas testified that there was never any indication Father was unable to work. Despite this, Father never rendered any monetary support of any kind throughout the whole custodial period. Father's only examples of support were a birthday cake and a doll for Anari. These minimal gestures constitute token support. We find, as did the Juvenile Court, that the ground of failure to support was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of wanton disregard. The Juvenile Court made findings relative to Father's history of repeated incarceration and drug abuse during the Children's lives, and the evidence does not preponderate against those findings. Father's only argument on this ground is that his more recent incarcerations were based on probation violations rather than "additional crimes." However, this Court has held repeatedly that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). Father's repeated incarcerations, including on the basis of violation of probation, combined with his defiant attitude on the issue of his drug abuse, together

---

[4] Tenn. R. Civ. P. 15.04 provides: "Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor."

qualify as conduct showing wanton disregard for the Children's welfare. We find, as did the Juvenile Court, that the ground of wanton disregard was proven by clear and convincing evidence.

Continuing our review of grounds, we next address whether the Juvenile Court erred in finding the ground of failure to provide a suitable home. On this issue, Father argues that DCS failed to engage in reasonable efforts to assist him in the four months immediately following removal. Father states:

> Petitioner has failed to establish by clear and convincing evidence that during the period of April 30, 2019 to August 30, 2019 that DCS made reasonable efforts to assist [Father] in obtaining housing other than to provide him with a list of housing possibilities within Hickman County. It was based upon this list that [Father] contacted Buffalo Valley and placed his name on the waiting list for housing. If DCS, with their superior knowledge is unable to provide parents with housing options that will materialize within the first 4 (four) months of children being placed in foster care then it is impractical to believe parents facing housing issues due to poverty would have any better luck.

The Juvenile Court's findings relative to this issue addressed DCS's efforts throughout the custodial period but also specifically encompassed the four months immediately following the Children's removal. The evidence does not preponderate against the Juvenile Court's finding that DCS's efforts were reasonable. Father's efforts, in contrast, were sporadic. When Thomas presented Father with housing options outside of Hickman County, he rejected them as unacceptable. Father also failed to ever follow up on a walk-through at his mother's house. In addition, Father failed to complete a drug and alcohol assessment, which bears directly on whether any housing he obtains would be suitable for the Children. While Father told Thomas shortly before trial that he had been accepted into housing at Buffalo Valley, this tardy development is insufficient to establish that Father has provided a suitable home for the Children. The Juvenile Court correctly stated that a suitable home is not just a good physical space. We find, as did the Juvenile Court, that the ground of failure to provide a suitable home was proven by clear and convincing evidence.

Moving from the abandonment grounds, we next address whether the Juvenile Court erred in finding the ground of persistent conditions. This ground is set forth in statute as follows:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order

entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2020).

There is no dispute that the Children were removed from Father's custody for a period longer than six months or that a petition for dependency and neglect was filed in the Juvenile Court. Father argues, however, that "there was no evidence presented to satisfy the requirement that the children would be subjected to further abuse or neglect if returned to the father." To revisit, the record reflects that Father has a drug problem. Father, in refusing a drug and alcohol assessment, informed Thomas that he would not complete a drug and alcohol assessment and that he would smoke marijuana until he died. We note here that the record contains evidence that Father's drug abuse went beyond marijuana, as he tested positive in October 2019 for amphetamines and methamphetamine in addition to THC. Father's brazen refusal to cooperate when real concerns exist about the Children's exposure to drug abuse in his care reflects a flippancy and lack of seriousness for the Children's well-being on Father's part. Beyond the issue of drugs, Father has never demonstrated residential stability. Father has been in and out of jail. Father is subject to a pending capias. Given Father's lack of improvement, in all reasonable probability the Children would be subjected to abuse or neglect were they to be returned to Father's care, as the conditions in Father's life regrettably are unstable and centered on drugs. We find, as did the Juvenile Court, that the ground of persistent conditions was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. This ground is set forth in statute as follows: "(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]"

-25-

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2020). Father asserts that he "completed several tasks on the permanency plan including safe and stable housing, legal source of income, and seeking mental health treatment with Centerstone." Indeed, Father made certain efforts to comply with the permanency plan. However, Father flatly refused a drug and alcohol assessment, a significant failure given Father's undisputed illegal drug use. Father never maintained residential stability. Father never rendered any support to the Children. Father never established paternity of Chrifayni. Father's instances of compliance with his responsibilities under the permanency plan were eclipsed by his major failures to comply in other areas, most notably his staunch refusal to submit to a drug and alcohol assessment. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence.

Concluding our review of grounds, we address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. This ground is set forth in statute as follows:

> (14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2020). With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). On this ground, Father makes the conclusory argument that "[t]he testimony did not establish by clear and convincing evidence either prong of the statute." On this first prong of the ground, the Juvenile Court found that Father manifested neither the ability nor the willingness to assume legal and physical custody of the Children, even though a finding as to either would be sufficient. The evidence does not preponderate against these findings. Father never obtained suitable or stable housing, never addressed his drug issues, and never paid a dime in child support despite purporting to work 40 hours per work and apparently having sufficient resources to use marijuana daily. Father has been incarcerated repeatedly. Notably, Father never bothered to establish paternity of Chrifayni. Taken as a whole, Father's *actions* in this case have manifested neither an ability or willingness on his part to assume custody of the Children, his statements to the contrary notwithstanding. We find, as did the Juvenile Court, that Father manifested neither the ability nor willingness to assume custody of the Children.

-26-

The second prong of this ground concerns whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The evidence reflects, as found by the Juvenile Court, that it would be unsafe for the Children to return to Father's care. Father has failed to demonstrate sobriety or stability despite his record of drug abuse. On the contrary, Father insisted unequivocally to Thomas that he would not complete a drug and alcohol assessment and would never stop using marijuana. Under these circumstances, the risk to the Children's well-being is clear. If Father refuses even an assessment, there can be no confidence that he can maintain sobriety in order to safely parent the Children. Given Father's unabashed drug use, as well as his continual failure to achieve stability, an unacceptable risk of harm would inhere were the Children returned to Father's care. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Children's best interest. In a parental rights termination case, Tennessee courts look to the following non-exclusive factors in rendering a best interest determination:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

Father asserts that he "has established a safe and stable home, has fulltime employment to meet the needs of the family, and [is] addressing his mental health needs." Father states further that DCS's efforts to assist him were not reasonable. Regarding Anari's allegations against him of physical abuse toward her sister, Father contends that these allegations are suspect and that Anari is in therapy in part to address behaviors such as lying. Father argues also that he could not develop a relationship with the Children because his visitations were suspended. With regard to his failure to pay child support, Father states it was because "he has been trying to use his financial resources to better his situation for the benefit of the children." Father does not cite to the record for that assertion, nor any of his assertions as to best interest.

We are mindful that Father's visitations were suspended. The Juvenile Court declined to find the ground of failure to visit in view of the restrictions on Father's ability to visit. However, Father was not helpless, either in helping create the conditions in which visitation could resume or in improving conditions in his life generally. Father never displayed residential stability, instead living on and off with his mother. Father has been in jail a number of times, and had a pending capias as of trial. Despite purporting to work a full-time job, Father has never paid any child support. These facts, as found by the Juvenile Court, reveal that Father is unable and/or unwilling to parent the Children at this time, or any time soon. In contrast, the evidence shows that the Children are getting on well with Great Aunt, who intends to adopt the Children if given the chance. The record reflects that a change in caregiver would be especially traumatic for Anari, who has endured exceptional hardship including the tragic death of her mother which she witnessed. As found by the Juvenile Court: "It is not in the children's best interests to delay permanency for another six months to see if things are going to [be] different with Father. They are living the life that the legislature opposes: foster care beyond that which is reasonably necessary." In the final analysis, Father's refusal to address his drug use is the overarching obstacle to his resuming custody of the Children in any kind of healthy and safe manner. Father told Thomas that "he uses marijuana daily and would use it until he died and he was not going to take the -- or complete the alcohol and drug assessment." In essence, Father chose drugs over a chance to resume custody of the Children.

The Juvenile Court made its detailed findings, quoted above, as to the Children's best interest. The Juvenile Court found that all statutory best interest factors, save for factor (8), favored termination of Father's parental rights to the Children. The evidence does not preponderate against these findings. We find, as did the Juvenile Court, that termination of Father's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Juvenile Court terminating Father's parental rights is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Desia E., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE